UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

SAFET RAMA,

                Plaintiff,

-v-

ACTING COMMISSIONER
OF SOCIAL SECURITY,[1]

                Defendant.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __12/05/2023__

**OPINION
& ORDER**

22-CV-6928 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Safet Rama ("Rama") commenced this action against Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("Commissioner"), seeking review of the Commissioner's denial of Title II Social Security Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Rama's motion is denied, and the Commissioner's cross-motion is granted.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Acting Commissioner is substituted for the Commissioner as the defendant in this action.

# I. BACKGROUND

## A. Procedural History

On November 18, 2019, Rama filed applications for both DIB and SSI, alleging a disability onset date ("DOD") of March 4, 2016.  Administrative Record ("AR") at 10, Dkt. No. 11-2.[2]  The Social Security Administration ("SSA") denied both claims, first on October 7, 2020, and then again on appeal on November 19, 2020.  *Id.*[3]

Rama then requested a hearing before an Administrative Law Judge ("ALJ") on November 30, 2020.  *Id.*  On March 2, 2021, represented by counsel, Rama attended and testified at a hearing before ALJ Sharda Singh.  *Id.* at 31–72.  The hearing took place by telephone due to the extraordinary circumstances presented by the COVID-19 pandemic.  *Id.* at 33.  During the hearing, Rama consented to amending the DOD to July 3, 2018, the earliest allowable date after the July 2018 denial.  *Id.* at 43.  In a decision dated June 28, 2021, the ALJ denied Rama's claims, finding him not disabled from the period of July 3, 2018, through the date of the

---

[2] Unless otherwise specified, the page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.  The AR spans several ECF filings but, since the pagination is continuous, the Court will refer to the bottom right pagination and include the corresponding docket number as appropriate.

[3] Prior to this action, Rama applied for DIB and SSI on March 24, 2016, which was denied on July 2, 2018 ("July 2018 decision" or "July 2018 denial").  AR at 42; *see* AR at 76–89, Dkt. No. 11-3.  His appeal of the July 2018 decision was denied on May 2, 2019.  *Id.* at 96–98, Dkt. No. 11-3.  Rama did not seek further review of this denial.  AR at 42, Dkt. No. 11-2.

decision.  *Id.* at 20.  Rama then sought review of the ALJ's decision by the Appeals Council, which was denied on June 30, 2022, rendering the ALJ's decision the final decision of the Commissioner.  *Id.* at 1–3.

Rama timely commenced this action on August 15, 2022, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Complaint ("Compl."), Dkt. No. 1.  The Commissioner answered Rama's complaint by filing the administrative record on December 5, 2022.  Dkt. No. 11. On February 6, 2023, Rama moved for judgment on the pleadings and submitted a memorandum of law in support of his motion.  Notice of Motion, Dkt. No. 18; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 19.  The Commissioner cross-moved for judgment on the pleadings on May 8, 2023, and submitted a memorandum in support of her cross-motion.  Notice of Cross-Motion, Dkt. No. 27; Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion ("Def. Mem."), Dkt. No. 28.  On May 30, 2023, Rama submitted reply papers.  Reply Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Reply"), Dkt. No. 29.

### B. The Administrative Record

#### 1.    Rama's Background

Rama was born on October 31, 1971, in Macedonia.  AR at 44, Dkt. No. 11-2. He was 46 years old on the amended alleged DOD.[4]  At the time of the hearing,

---

[4] In the ALJ's decision, Rama's age at the alleged DOD is incorrectly listed as 44, likely based on the originally alleged March 4, 2016 DOD rather than the amended

Rama lived in the Bronx with his wife and 15-year-old daughter.  AR at 62, Dkt. No. 11-2; AR at 283, Dkt. No. 11-4.  He received a second-grade education in Macedonia, and moved to the United States at age seven.  AR at 44, Dkt. No. 11-2.[5]  He cannot read or write English and previously worked as a baker.  *Id.* at 44–45.

Rama claims that he suffers from both mental and physical ailments that render him unable to work.  *Id.* at 48, 57.  He testified that he has heart problems related to a stent placement procedure in 2016 and a previous gunshot wound, causing him chest pain, and that he has high blood pressure and diabetes.  *Id.* at 48.  He also testified that he suffers from anxiety that has forced him to miss work.  *Id.* at 52.  Rama alleged that these ailments limit him to only working two hours out of an eight-hour workday and leave him unable to bend over, reach overhead, tie his shoes, or lift and carry anything heavier than five pounds.  *Id.* at 55.

In February 2018, Rama was prescribed the following medications: Aspirin, Lipitor, Plavix, Pepcid, Diabeta, Imdur, Glucophage, Toprol-XL, Nitrostat, Effexor XR, and Coumadin.  *Id.* at 434, Dkt. No. 11-7.

On November 6, 2019, Rama claimed in an Adult Disability Report that he suffered from the following medical conditions: "Major [D]epression; Anxiety; Heart Problems; Bipolar [Disorder] and Hallucinations; [and] Sleep Impair[ment]."  AR at

---

July 3, 2018 DOD.  *See* AR at 19, Dkt. No. 11-2.  Similarly, Rama's memorandum of law misstates his age at the time of the amended DOD.  *See* Pl. Mem. at 17.

[5] Rama testified that he completed second grade in Macedonia before he arrived in the United States at age seven.  AR at 44.  Rama's Memorandum of Law inconsistently states that he completed fourth grade in Macedonia.  *See* Pl. Mem. at 17.

342, Dkt. No. 11-6.  At the time he filed the disability report, Rama reported taking "venlafaxine; mirtazapine; [and] Abilify."  *Id.* at 345.[6]

### 2.  Relevant Medical Evidence

In his motion papers, Rama has provided a summary of the medical evidence contained in the administrative record.  *See* Pl. Mem. at 2–17.  The Commissioner has also provided a summary of the same.  *See* Def. Mem. at 2–4.  Having examined the record, the Court adopts the parties' summaries as accurate and complete for purposes of the issues raised in this action.  *See, e.g.*, *Thomas v. Saul*, No. 19-CV-6990 (MKV) (RWL), 2020 WL 5754672, at *1 (S.D.N.Y. July 24, 2020) (adopting parties' medical opinion summaries), *adopted sub nom. Thomas v. Comm'r of Soc. Sec.*, 2020 WL 4731421 (Aug. 14, 2020).

The Court will discuss the medical evidence pertinent to the adjudication of this case in Section II.B below.

### 3.  ALJ Hearing

At the hearing before ALJ Singh on March 2, 2021, counsel for Rama explained that, due to the pandemic, he had had difficulty obtaining Rama's relevant cardiac care records and was therefore unable to timely submit them.  *Id.* at 38–39.  The ALJ nonetheless allowed counsel to submit the records after the submission deadline.  *Id.*  Counsel then explained that he was having similar pandemic-related difficulties obtaining Rama's psychiatric records from Montefiore

---

[6] In the section of the Disability Report addressing medications, Rama lists "veniafaxine" as one of the prescribed medications.  Based on the other available evidence in the Administrative Record, the Court believes this was supposed to be venlafaxine.  *See, e.g.*, AR at 342.

Medical Center ("Montefiore").  *Id.* at 39.  Nonetheless, counsel told the ALJ that

"there [was] sufficient evidence [in the submitted Montefiore physical health

records]" and that "[he] believe[d] th[e] case c[ould] be decided based [there]on."  *Id.*

at 40.  Counsel added that if the ALJ thought additional psychiatric health records

were needed—records that he was having difficulty obtaining—then she should

subpoena them.  *Id.* at 40.  The ALJ replied that she "[did] think [she] need[ed]

[additional] psychiatric records" and gave counsel 21 additional days to obtain and

submit the necessary records, as she was not issuing subpoenas due to the

pandemic.  *Id.* at 40–41.

At the hearing, the ALJ addressed Rama's previous denial of DIB and SSI in

2018, as well as his denial on appeal in 2019.  *Id.* at 42; *see* AR at 76–78, Dkt. No.

11-3 (notice of July 2018 decision); *see also* AR at 96–98, Dkt. No. 11-3 (denial of

appeal of 2018 decision).  Rama then consented to amending the DOD to July 3,

2018, the earliest date allowable given the July 2018 denial.  *Id.* at 43.

When asked by the ALJ about his physical impairments that prevented him

from working, Rama stated that he had heart problems, diabetes, chest pain, and a

"bullet wound . . . in [his] chest" from his past that "bothers [him] nonstop."  *Id.* at

48.[7]  Rama reported that he had been to the emergency room several times due to

chest pain, high blood pressure, and diabetes.  *Id.*  Rama stated that, when he was

---

[7] In his consultative medical examination, Dr. Allen Meisel noted that "[i]n the
1990s, [Rama] had a gunshot wound to his abdomen.  He was hospitalized for two
years . . . He has no memory of what was done.  He has an abdominal scar
extending from his [lower sternum] to his [pelvis]."  AR at 1175.

at the hospital, he was given Warfarin intravenously. *Id.* at 49. Rama then

confirmed that his physician and cardiologist—Dr. Valeri Kazakov and Dr. Joseph

Helft, respectively—"know[] [his] condition best." *Id.*

Rama told the ALJ that he takes medication three times daily, including

eight different medications in the morning that make him feel "weak." *Id.* at 49–51.

Rama stated that he took the medications for his "mental problems" as well as his

physical ailments. *Id.* at 50. He expressed that "[his] problem is with [his] anxiety,

[and] with [his] medication which is—you don't want to go one day, two days to

work, and then the next day you call [in] sick, and you end up in the hospital." *Id.*

at 52.

When asked "[h]ow many hours [he] could . . . sit and do something during an

eight[-]hour day . . . doing some sort of simple work" at "a job sitting at a desk or

table," Rama replied, "two hours." *Id.* at 54. He gave the same answer when asked

about "a job standing in a store, behind a counter . . . doing something simple." *Id.*

Rama testified that he cannot stoop or bend from the waist to pick something up

because of the lasting effects of his gunshot wound surgery, and that he has

difficulty reaching overhead. *Id.* Rama further explained that he has trouble tying

his shoes, though he can dress himself, *id.* at 55; that "[he] [does not] feel like . . .

tak[ing] a shower" . . . [more than] once a week" due to his psychiatric condition;

and that his wife does all the driving and grocery shopping. *Id.* at 63.

Rama told the ALJ that his "physical problem[s], [they] don't stop me. It [sic]

just my anxiety is [sic] really bothers me." *Id.* at 55–56. He stated that he had been

receiving mental health treatment at Montefiore from Dr. Candace Hatten and Licensed Clinical Social Worker ("L.C.S.W.") Neury Rosario since 2016 and had "talk therapy" with Rosario every week. *Id.* at 56. Rama confirmed that his psychiatric problems were "a result of [his] heart problem." *Id.* at 57. He described how he broke down crying at work, "like . . . a little kid," and then later experienced an auditory hallucination while he was driving home from work. *Id.* at 57–58. The auditory hallucination sounded like a child encouraging him to "hit the gas, drive so fast and go hit the car [into a tree]." *Id.* Rama also shared that he experienced a visual hallucination, describing how when he got home that evening "all the cars disappear[ed]" from the street. *Id.* He stated that the next morning after this hallucination, he went to see Dr. Kazakov with his wife and told the doctor that he "want[ed] to kill [him]self." *Id.* at 59. Rama further stated that, after this incident, Dr. Kazakov referred him to inpatient psychiatric care "for [a] couple of days" at Montefiore. *Id.* After arriving at the facility, Rama remained only "for six, seven hours" before his wife "took [him] out." *Id.* Rama then told the ALJ that he is "getting worse," as he still experiences auditory hallucinations, "[doesn't] want to be with too many people," and "[doesn't] feel safe"—even with [his] wife." *Id.* at 59–60.

Rama testified that he "[had] good days and bad days with [his] condition," and that on bad days he "like[s] to scream, to yell." *Id.* at 60. He stated that he did not sleep, only "[lying] down probably for two hours" a night. *Id.* He also described that his memory was not as good as it used to be, and he had trouble remembering phone numbers. *Id.* at 61 ("I cannot remember the way I used to remember. Like

8

before I could remember so many phone[] [numbers]. . . . Now I don't remember not

even one.  The only phone [number] that I could remember is only mine.").  He

added that if someone gave him instructions for 10 to 15 minutes about a task to do,

he would need to ask for clarification "at least a couple of time [sic] to get it done."

*Id.*  When asked what keeps him from working, Rama stated: "nobody wants you for

one day, two days, to go to work and the next day you call in sick.  You're going to

get fired."  *Id.* at 61–62.

The ALJ then posed a series of hypotheticals to Vocational Expert ("VE")

Jeannie Deal.  *Id.* at 64–68.  First, the VE classified Rama's previous work as a

baker as "medium [exertional level] as performed."  *Id.* at 65.  The ALJ then

presented the VE with the first hypothetical:

> [A]n individual of the same age, education and past work
> experience as the claimant is limited to a light exertional
> level.   Is further limited to avoiding hazards such as
> moving machinery and unprotected heights.  And is
> further limited to understanding, remembering and
> carrying out simple, routine, repetitive non-complex tasks
> with occasional contact with supervisors, co-workers and
> the general public . . . Is to never climb ladders or
> scaffolds.  Can occasionally climb ramps, stairs, balance,
> stoop, kneel, crouch and crawl.  Based upon those
> limitations, could such an individual perform any past
> work?

*Id.*  The VE replied that "past work would be precluded."  *Id.*  When the ALJ asked

if there were any other jobs in the national economy such an individual could do,

the VE replied that an individual could work as "a parts cleaner and polisher," "a

price marker," and "a housekeeping cleaner."  *Id.* at 66.

The ALJ next asked, "[i]f an individual" similar to the previous hypothetical "need[ed] to take unscheduled breaks outside of the normal eight[-]   hour breaks resulting in an individual being off task for more than 15 percent of a workday," whether such an individual could perform any past work or any other jobs." *Id.* The VE replied that such conditions would be "work preclusive." *Id.* The ALJ then asked whether "an individual [who] would be absent for more than two days during a work . . . month[] could . . . perform any past work or any other jobs." *Id.* at 66–67. The VE replied that such conditions would also be "work preclusive," and that "past work would be precluded" for any individual with such conditions. *Id.* at 67.

The ALJ next posed a second hypothetical regarding an individual with a "sedentary exertional level" and the same limitations as the first hypothetical (*i.e.*, work that avoids certain hazards, consisting of simple, routine, repetitive non-complex tasks with occasional contact with supervisors, co-workers and the general public). *Id.* When asked if such an individual could perform any past work, the VE replied that such work would be precluded. *Id.* When asked if there were any other jobs in the national economy for such an individual, the VE replied that

an individual could work as a "final assembler,"[8] "weight checker,"[9] or an "ampoule sealer."[10]  *Id.*

The ALJ then posed her final hypothetical to the VE: whether "[in the sedentary hypothetical,] an individual [who] would be off task for more than 15 percent of a workday due to unscheduled breaks outside of the normal eight[-]hour breaks," or "an individual [who] would be absent from work for more than [two] days a month[] could . . . perform any past work or any other jobs."  *Id.* at 67–68. The VE replied in the negative.  *Id.* at 68.

The ALJ completed her questioning of the VE and then gave Rama's counsel the opportunity to pose hypotheticals to the VE.  *Id.*  Rama's counsel asked the VE whether an individual experiencing "episodes of deterioration or decompensation in a work setting, where the individual withdraws from the situation, and has to stop what they're doing, would . . . be able to hold any of the [aforementioned] jobs."  *Id.* at 69.  The VE replied that if such an individual were required to spend more than 10 percent of the time off-task, then it would be work preclusive.  *Id.*  Counsel then

---

[8] A final assembler (of optical goods) "[a]ttaches nose pads and temple pieces to optical frames, using handtools . . . [and] [p]ositions parts in fixture to align screw holes . . . [and then] [i]nserts and tightens screws, using screwdriver."  EMP. & TRAINING ADMIN., U.S. EMP. SERV., U.S. DEP'T OF LABOR, 2 DICTIONARY OF OCCUPATIONAL TITLES 709 (1991) ("DOT").

[9] Based on the DOT number cited, the VE misstated the check weigher job title as "weight checker."  AR at 67.  A check weigher "[w]eighs each cup containing powder charge [in an artillery ordnance] . . . [according] to specifications."  DOT at 763.

[10] An ampoule sealer is someone who "[s]eals ampoules"—*i.e.,* glass vials—"filled with liquid drug products . . . [and] test[s] [them] for leaks."  DOT at 452.

asked whether work existed in the national economy for someone whose "ability to maintain regular attendance and be punctual, deal with stress and work in coordination or proximity to others without being unduly distracting, and completing a normal work week without interruptions" could only be sustained "up to one-third of an eight[-hour] workday, or one-third of a week." *Id.* at 70. The VE replied that it did not. *Id.*

### 4. The ALJ's Decision

The ALJ denied Rama's application in an 11-page decision on June 28, 2021. *Id.* at 10–20, Dkt. No. 11-2. In so doing, she concluded that he was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act from July 3, 2018, through the date of the decision. *Id.* at 20.

Following the five-step test set forth in the SSA regulations, the ALJ first determined that Rama had not engaged in "substantial gainful activity" since the alleged DOD of July 3, 2018. *Id.* at 13.

At step two, the ALJ determined that Rama has the following severe impairments: "coronary artery disease, diabetes, high cholesterol, hypertension, bullet wound in the chest, depressive disorder and anxiety disorder." *Id.* The ALJ also considered Rama's February 2020 treatment for a small bowel obstruction, but determined that this condition was "non-severe" as the evidence suggested "it [had] no more than a minimal effect on [Rama's] ability to perform basic work activities." *Id.* (citation omitted).

Proceeding to step three, the ALJ found that Rama's severe and non-severe physical impairments, considered singularly and in combination, did not satisfy any

impairment listed in 20 CFR, Part 404, Subpart P, Appendix 1.  *Id.*  She considered Rama's cardiac condition as defined in listing 4.04.  *Id.*  However, she found that it did not meet the outlined criteria of "limited exercise tolerance testing results . . . or three separate ischemic episodes requiring revascularization within a 12-month period or . . . very serious limitation in the ability to perform activities of daily living."  *Id.*  The ALJ further determined that Rama's mental impairments, considered individually and in combination, did not satisfy the criteria of listings 12.04 and 12.06.  *Id.*  In making this determination, the ALJ considered whether the "paragraph B" criteria were satisfied.  *Id.* at 13–15.  She found that Rama's mental impairments did not meet the limitation requirements for a mandatory finding of disability.  *Id.* at 13.

The ALJ then determined that Rama had moderate limitations in (1) understanding, remembering, or applying information; and (2) interacting with others.  *Id.* at 14.  Regarding Rama's limitations in understanding, remembering, or applying information, the ALJ found that, "while he might have difficulty concentrating on complex work tasks, he is able to perform basic, simple, and repetitive types of tasks."  *Id.*  Regarding Rama's limitations in interacting with others, the ALJ found that he "was cooperative and related adequately at examinations and the [ALJ] hearing[,]" and "[w]hile [he] reported that he did not socialize with friends, he is able to live with family members."  *Id.*

The ALJ also determined that Rama had moderate limitations in adapting or managing himself, finding that "[u]pon mental status examinations, he was noted to

be well groomed, cooperative, dressed appropriately[,] and had appropriate eye contact." *Id.* at 15.  She also noted that "[w]hile testifying at the [ALJ] hearing, [Rama] followed the proceedings and stayed on point." *Id.*

Next, the ALJ determined that Rama had mild limitations concentrating, persisting, or maintaining pace.  AR at 14.  The ALJ noted that Rama "showed no difficulty staying on point and focusing during examinations or the [ALJ] hearing," and that while he "may have difficulties in performing highly complex work tasks . . . he should be able to perform unskilled work tasks." *Id.*

At step four, the ALJ found that Rama had "the residual functional capacity ["RFC"] to perform light work" with the following exceptions:

> [Rama] can never climb ladders, ropes scaffolds [sic], can occasionally climb ramps and stairs, stoop, kneel, crouch, balance and crawl.  [He] must avoid hazards such as moving machinery and unprotected heights.  [He] is limited to simple, repetitive and routine and non-complex tasks which require only occasional contact with supervisors, coworkers and public.  He is limited to jobs requiring occasional changes in customary work setting.

*Id.*  In so finding, the ALJ "considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence," in addition to "medical opinion(s) and prior administrative material finding(s)." *Id.*

Considering the objective evidence first, the ALJ discussed eight different exhibits from Montefiore, including more than 500 pages of medical records regarding Rama's physical impairments.  *Id.* at 16.  The ALJ noted that Rama was regularly admitted to the hospital from 2018 to 2021 for various complaints of chest

14

pain, dizziness, and weakness, and how either "[p]hysical examination[s] of [Rama] [were] normal" or "[r]eports noted that . . . [Rama] left [the facility] against medical advice, indicating that his symptoms had resolved." *Id.* The ALJ also discussed Rama's treatment for a small bowel obstruction in February 2020, and his follow-up cardiac care at NY Cardiac Care Associates in 2020 for coronary artery disease, as well as his history of "hypertensive disease without heart failure and coronary artery disease without angina." *Id.* The ALJ further noted how, as recently as December 2020, Rama's "coronary artery disease was stable, and his chronic chest pain was most non-cardiac in nature and also stable." *Id.*; *see also id.* at 1206 (cardiologist's treatment notes).

The ALJ also discussed Montefiore psychiatric records from which she concluded that Rama underwent treatment for "depressive disorder with medications prescribed" and that Rama's "[m]ental status examinations showed that [he] was cooperative, with normal speech, depressed mood, logical thought processes and intact attention, concentration and memory." *Id.*

The ALJ then turned to discussing relevant medical opinions. *Id.* at 16–18. First, she referred to Dr. Hatten's October 2019 report, which described Rama's "treat[ment] for a current depressive disorder and generalized anxiety disorder" and observed that Rama "exhibit[ed] intermittent adherence to his scheduled appointments." *Id.* at 16.[11] Dr. Hatten opined that Rama was "likely to miss work

---

[11] The ALJ's decision refers to the medical source statement's author as Dr. Candace rather than Dr. Hatten, mistakenly using Dr. Hatten's first name. *See* AR

more than 3 times per month and to have moderate limitations in activities of daily living, social functioning and concentration, persistence and pace." *Id.* at 16. The ALJ found Dr. Hatten's opinion unpersuasive, as it "[was] not supported by or consistent with treatment notes, clinical examination findings or the conservative nature of care prescribed." *Id.* at 18.

Next, the ALJ discussed Dr. Kazakov's October 2019 medical source statement, which noted that Rama "was treated for a depressive disorder, anxiety disorder and chronic chest pain[,]" and that Rama was "able to lift and carry up to 10 pounds occasionally and stand and walk for 1 hour and sit for 2 hours per 8[-]hour day and would require rest periods." *Id.* at 17. The ALJ found Dr. Kazakov's opinion unpersuasive as it was "not supported by or consistent with any clinical examination findings or treatment notes." *Id.*

The ALJ then considered the psychiatric and physical consultative examinations performed by Drs. Joshua Goldstein and Allen Meisel in August 2020. *Id.* Dr. Goldstein opined that Rama had "mild" limitations

> understanding, remembering, or applying simple and complex directions and instructions; using reasoning and judgment to make work-related decisions; interacting adequately with supervisors, coworkers, and the public; sustaining concentration and performing a task at a consistent pace; regulating emotions, controlling behavior, and maintaining well-being; maintaining personal hygiene and appropriate attire and in awareness of normal hazards and taking appropriate precautions.

---

at 591.

*Id.* at 17 (citation omitted).  The ALJ also discussed Dr. Goldstein's opinion that Rama had "moderate evidence of limitation sustaining an ordinary routine and regular attendance at work."  *Id.*  She addressed Dr. Goldstein's diagnosis of Rama's major depressive disorder and generalized anxiety disorder, noting that during the examination Rama was "cooperative and exhibited an adequate manner of relating, social skills and overall presentation"; had "good hygiene . . . and normal motor behavior and appropriate eye contact"; had "a neutral mood, full and appropriate affect, normal speech, coherent thought processes and impaired attention, concentration and memory"; and "had below average cognitive functioning and fair insight and judgment[,] . . . reporting that he was able to groom himself but . . . that he stayed in bed all day."  *Id.*  The ALJ found Dr. Goldstein's psychiatric consultative examination persuasive, concluding that "[t]he mild to moderate limitations found [were] consistent with the clinical examinations findings, which were normal other than for limitations in attention, concentration and memory."  *Id* at 18.

The ALJ then discussed Dr. Meisel's August 2020 consultative physical examination of Rama, noting Dr. Meisel's opinion that Rama "was . . . in no acute distress and . . . [had] no trouble dressing or undressing or getting on or off the examination table."  *Id.* at 17.  She also discussed Dr. Meisel's opinion that Rama had "full 5/5 strength in the upper and lower extremities . . . with no evidence of motor or sensory deficits" and his diagnosis of Rama's "coronary artery disease, status post two stent placements, hypertension, diabetes, [high cholesterol], status

17

post gunshot wound to the abdomen and depression with anxiety." *Id.* The ALJ also considered Dr. Meisel's opinion that Rama "should [a]void activities which are mildly to moderately strenuous []and [that he] had marked limitation[s] in heavy lifting and carrying, climbing ladders, scaffolds and being expos[ed] to unprotected heights." *Id.* The ALJ found Dr. Meisel's opinion persuasive, as it was "consistent with the normal physical examination findings and [took Rama's] cardiac history into account in limiting [him] from mild to moderate exertional activities." *Id.* at 18.

The ALJ then proceeded to consider the subjective evidence, determining that while his impairments could be the cause of his alleged symptoms, Rama's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the" record evidence. *Id.* at 17. In so concluding, the ALJ noted how all of Rama's physical impairments were "generally controlled with medications," not severe enough that Rama consistently "reported not taking medications and/or [leaving the hospital] against medical advice," or without "significant secondary complications." *Id.* at 17–18 (citations omitted). The ALJ noted that there was "evidence of scant, conservative treatment for complaints of depression and anxiety" and that "repeated mental status examinations of [Rama] were negative." *Id.*

The ALJ next determined that the opinions of state agency examiners Drs. S. Putcha and M. Kirsch—whose opinions (that Rama could "perform a light range of work") she did not otherwise mention in the decision—were persuasive. *Id.* at 18.

Similarly, the ALJ found state agency examiners Drs. T. Inman and T. Bruni's opinions, that Rama "[had] moderate mental limitations," persuasive and "well supported by the evidence cited to and . . . generally consistent with the opinion[s] of the consultative examiner[s] [Drs. Meisel and Goldstein]." *Id.*

At the conclusion of step four the ALJ found that, based on all the evidence in the record, Rama had the RFC to perform light work with the aforementioned exceptions and that this conclusion was "supported by the conservative nature of treatment prescribed, the minimal clinical examination findings and the opinions of the consultative and state agency physicians." *Id.* at 18.

At step five, after considering the vocational expert's testimony and Rama's demographic information, the ALJ concluded that Rama could perform jobs such as cleaner and polisher, price marker, and housekeeper/cleaner—all of which existed in significant numbers in the national economy. *Id.* at 20. Accordingly, the ALJ concluded that Rama was not disabled prior to the date of decision. *Id.*

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (incorporating the judicial review provided in § 405(g) for SSI). The district court must determine whether the Commissioner's final decision applied the correct legal

19

standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (cleaned up); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.") (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (cleaned up)). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (alteration in original) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  "[T]he ALJ should consider not

21

only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim." *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021 WL 5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No. 15-CV-144 (WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016)); *see also Milliken v. Saul*, No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17, 2021) ("A 'closed period' of disability occurs where a claimant is found by the Commissioner to be disabled for a finite period of time which began and ended prior to the date of the agency's administrative determination of disability.").

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled." *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.

§ 404.1520(a)(4).  First, the Commissioner establishes whether the claimant is presently employed.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *See id.*; 20 C.F.R. § 404.1520(d).

If the claimant's impairment does not meet or equal a listed impairment, then the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  *See* 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See, e.g.*, *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. § 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted). Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No.

02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation marks omitted). For Supplemental Social Security Income and Social Security Disability Insurance applications filed prior to March 27, 2017, SSA regulations set forth the "treating physician rule," which required an ALJ to give more weight to the opinions of physicians with the most significant clinical relationship with the plaintiff. 20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2); *see also, e.g., Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004). Under the treating physician rule, an ALJ was required to give "good reasons," 20 C.F.R. § 404.1527(c)(2), if she determined that a treating physician's opinion was not entitled to "controlling weight," or at least "more weight," than the opinions of non-treating and non-examining sources. *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y.

2000).  In addition, a consultative physician's opinion was generally entitled to "little weight." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

However, in January 2017, the SSA revised its regulations regarding the evaluation of medical opinions for claims filed on or after March 27, 2017 (such as Rama's claim in this case).  *See* Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  "In implementing new regulations, the SSA has apparently sought to move away from a perceived hierarchy of medical sources."  *Velasquez v. Kijakazi*, No. 19-CV-9303 (DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed. Reg. 5844).  The new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)).  "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors': (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'"  *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies.  20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b).  Under the new regulations, the ALJ must "explain how he considered" both the supportability and consistency factors, as they are "the most

important factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 160 (S.D.N.Y. 2022) ("[t]he new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight," referring to the supportability and consistency factors).  Evaluating "supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021) *adopted by* 2022 WL 717612 (Mar. 10, 2022).  With regard to consistency, "the new rules provide that the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)); *see generally* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion).  *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "[W]hen the opinions offered by two or more medical sources about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, the ALJ [should] articulate how he considered the remaining factors in evaluating the opinions." *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8

(W.D.N.Y. 2021) (quotation marks removed) (citing 20 C.F.R. §§ 404.1520c(b)(3),

416.920c(b)(3)).

Courts considering the application of the new regulations have concluded

that "the factors are very similar to the analysis under the old [treating physician]

rule." *Velasquez*, 2021 WL 4392986, at *20 (quoting *Dany Z. v. Saul*, 531 F. Supp.

3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas*, 2021 WL 363682, at *9 (collecting

cases) ("[T]he essence of the rule remains the same, and the factors to be considered

in weighing the various medical opinions in a given claimant's medical history are

substantially similar."). "This is not surprising considering that, under the old rule,

an ALJ had to determine whether a treating physician's opinion was supported by

well-accepted medical evidence and not inconsistent with the rest of the record

before controlling weight could be assigned." *Acosta Cuevas*, 2021 WL 363682, at

*9; *see also e.g., Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL

5848776, at *5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were

foundation of treating physician rule).

"The failure to properly consider and apply" supportability and consistency

"is grounds for remand." *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021

WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021); *see also Rosario v. Comm'r of Soc. Sec.*,

No. 20-CV-7749 (SLC), 2022 WL 819910, at *8 (S.D.N.Y. Mar. 18, 2022) ("ALJ must

explain in all cases how [he or she] considered" supportability and consistency);

*Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at

*22 (S.D.N.Y. Dec. 30, 2020), *adopted by* 2021 WL 134945 (Jan. 14, 2021)

(remanding so ALJ can "explicitly discuss both the supportability and consistency of the consulting examiners' opinions"). "An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d at 265). However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health & Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Id.* (citing 20 C.F.R. § 404.1529(a)). The kinds of evidence that the ALJ must consider (in addition to objective medical evidence) include:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).  The ALJ need not list "each of the seven factors" in her decision, as long as it shows she evaluated claimant's credibility "by considering all of the relevant evidence."  *See, e.g., Lane v. Saul*, No. 18-CV-5523 (PGG) (OTW), 2020 WL 3965257, at *9 (S.D.N.Y. Mar. 16, 2020) (citation omitted), *adopted by* 2020 WL 1876325 (Apr. 15, 2020).

**B. Analysis**

Rama appeals the ALJ's decision on five grounds: first, he argues that the ALJ failed to properly develop the record (Pl. Mem. at 20–23); second, he argues that the ALJ failed to properly evaluate the medical opinion evidence (Pl. Mem. at 23–27); third, he argues that the ALJ's findings are inconsistent with medical opinions that the ALJ found persuasive and the RFC finding was not supported by substantial evidence (Pl. Mem. at 27–30); fourth, he argues that the ALJ failed to properly evaluate time off task and absenteeism (Pl. Mem. at 30–32); and, fifth, he argues that the ALJ failed to properly evaluate his subjective symptoms or to consider his impairments in combination (Pl. Mem. at 32–36).   Each of these arguments is addressed in turn.

### 1.  The ALJ Properly Developed the Record

Rama first argues that the ALJ did not sufficiently develop the record because "[s]ignificant treatment records were not in evidence and . . . [therefore] the ALJ based her decision on an incomplete record."  Pl. Mem at 23.  The Commissioner counters that there were no obvious gaps in the record and thus

31

there was sufficient evidence for the ALJ to reach her determination.  Def. Mem. at 7–10.  For the following reasons, the Court agrees with the Commissioner.

An ALJ's duty to develop the record "takes on heightened importance with respect to a claimant's treating medical sources."  *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 583 (S.D.N.Y. 2022) (citation omitted) (discussing ALJ's duty to develop the record post-2017 amendment to the treating physician rule).  However, "an ALJ is not required to attempt to obtain additional evidence to fill *any* gap in the medical evidence; rather an ALJ is required to do so only where the facts of the particular [c]ase suggest that further development is necessary to evaluate the claimant's condition fairly."  *Shand v. Kijakazi*, No. 22-CV-7479 (JLC), 2023 WL 5162994, at *11 (S.D.N.Y. Aug. 11, 2023) (emphasis added) (internal quotation marks omitted) (quoting *Petrovic v. Comm'r of Soc. Sec.*, No. 15-CV-2194 (KMK) (PED), 2016 WL 6084069, at *10 (S.D.N.Y. Aug. 25, 2016), *adopted by* 2016 WL 6082038 (Oct. 14, 2016)).  Additionally, a district court may remand both on the grounds that the claimant's medical record was incomplete (and thus there was insufficient evidence in the record for the ALJ to fairly evaluate the claimant's condition), *see, e.g.,* *Kaplan v. Barnhart*, No. 01-CV-8438 (SJ), 2004 WL 528440, at *3–4 (E.D.N.Y. Feb. 24, 2004), as well as where plaintiff provides new evidence not previously considered by the Commissioner.  *See* 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (incorporating judicial review as laid out in § 405(g) for purposes of SSI).

Even where there is additional evidence missing from the record to be considered, "[t]o justify an order requiring the Commissioner to consider additional evidence[] [on remand] (1) the proffered evidence must be 'new and not merely cumulative of what is already in the record,' (2) it must be 'material,' and (3) the claimant must show that 'good cause existed for [his] failure to present the evidence earlier.'" *Hairston-Scott v. Comm'r of Soc. Sec.*, No. 20-758, 2021 WL 3777581, at *2 (2d Cir. Aug. 26, 2021) (quoting *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)); *Yucekus v. Comm'r of Soc. Sec.*, 829 F. App'x 553, 557 (2d Cir. 2020) (similar) (first citing 42 U.S.C. § 405(g); then citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) ("New evidence is material if it is both (1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative." (internal quotation marks omitted in original))).

Here, the ALJ did more than enough to fill any gaps in the record. For example, she asked counsel during the hearing if there were any additional documents that he needed to add to the record, to which counsel replied that "[he] believe[d] there [was] sufficient evidence [regarding Rama's physical impairments] for [the ALJ] to decide this case." AR at 40. Nonetheless, the ALJ decided that additional psychiatric records from Montefiore were needed, *id.*, which counsel had been unable to obtain despite previous attempts. *See id.*; *see also id.* at 1199 (Montefiore response to Rama's initial requests stating "no [psychiatric] record[s]" existed). Additionally, even though the ALJ was not issuing subpoenas at the time due to the pandemic, she kept the record open an extra 21 days to allow Rama's

counsel to obtain and submit any additional psychiatric treatment records. *See id.* at 41. She further advised Rama's counsel at the hearing: "[I]f you [still] don't [get the records]—then tell [me]—and I will go [get]—them." *Id.* at 40.

After the hearing, more than 2,000 pages of additional medical documents from Montefiore were added to the record. *See id.* at 422, 426 (cover letters from claimant's counsel to ALJ). This detailed addition contained (but was not limited to) medical records from on or around June 5, 2019 until on or around March 2, 2021: extensive treatment notes and records from 13 different emergency room visits when Rama was admitted and treated for chest pains; treatment notes from seven therapy sessions with L.C.S.W. Rosario; psychiatric treatment notes from one additional appointment with Nurse Practitioner Tazneen Chowdhury; and treatment notes and records from three appointments with Dr. Hatten. *See id.* at 1222–3326, Dkt. Nos. 11-13 to 11-80. These additional materials, however, included no records from Dr. Kazakov, though he was mentioned more than 40 times as a treating internal medicine physician in the new documents. *See id.*

While there are limited references to Rama's appointments with Dr. Kazakov in the record as supplemented, there appears to be a plausible reason for this lack of records: Rama was recommended to follow-up with Dr. Kazakov, but consistently failed to schedule appointments with him. There appear to be only four aftercare summaries in the record as supplemented that list a follow-up appointment with Dr. Kazakov—none of which lists specific appointment dates—unlike the other treatment appointments in the aftercare summaries (which list specific dates). *See,*

*e.g.*, *id.* at 1235 (summary from March 3, 2021 emergency room visit instructing Rama to follow up with Dr. Kazakov with no date scheduled); *id.* at 1328 (summary from October 22, 2020 emergency room visit instructing Rama to follow up with Dr. Kazakov with no date scheduled, and also listing scheduled follow-up appointments with N.P. Chowdhury on November 3, 2020 and L.C.S.W. Rosario on November 12, 2020); *id.* at 1746 (summary from November 10, 2019 emergency room visit instructing Rama to follow up with Dr. Kazakov "in 1 week(s)" with no date scheduled, also instructing Rama to follow up with Dr. Helft with no date scheduled and indicating a scheduled appointment with Dr. Hatten on November 13, 2019); and *id.* at 2751 (summary from September 5, 2020 emergency room visit instructing Rama to follow up with Dr. Kazakov with no date scheduled, also indicating scheduled upcoming appointments with Dr. Helft on September 16, 2020 and N.P. Chowdhury on September 28, 2020).

There is yet another instance in the additional record submission where Rama's records indicate that he "ha[d] no upcoming appointments scheduled." *Id.* at 2614 (summary from May 8, 2020 emergency room visit). Given this record, it appears that Rama often failed to schedule regular appointments with Dr. Kazakov when follow-up had been recommended. *See id.* at 1235, 1328, 1746, 2614, 2751. Accordingly, despite Rama's emphasis on the fact that "there is not a single treatment record from Dr. Kazakov in evidence," Pl. Mem. at 23, Rama neither addresses these scheduling irregularities, nor does he offer any evidence of the 48 appointments he claims "should" have occurred before the end of 2019. *Id.*

Moreover, given the extensive development of the administrative record, which spans well more than 3,000 pages, there is no suggestion that the ALJ could not have "evaluate[d] . . . [Rama's] condition fairly." *Shand*, 2023 WL 5162994, at *11. In this case, not only did the ALJ "provide[] . . . counsel with additional time to supplement the record after the first hearing[,] but [c]ounsel [also] provided the ALJ with additional documentation[,]" did not request a second hearing, and additionally "did not [further] indicate . . . that there were any outstanding documents [necessary to make a determination]." *Moody v. Comm'r of Soc. Sec.*, 848 F. App'x 470, 471 (2d Cir. 2021) (affirming district court's upholding of ALJ decision on grounds that ALJ sufficiently developed the record where counsel did not indicate incompleteness during a second hearing, and after admitting additional documents to the record subsequent to the first hearing). Nonetheless, Rama now claims, after an adverse determination, that there are still more psychiatric treatment notes missing from the record that would have changed the outcome of the ALJ's determination. Pl. Mem. at 22.

Rama argues that additional development of the record is required because some of the alleged missing documents are psychiatric in nature, and therefore "the ALJ's duty to develop the record is [further] enhanced." Pl. Mem. at 21 (citing *Camilo v. Comm'r of Soc. Sec. Admin.*, No. 11-CV-1345 (DAB) (MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013)). While that may be true as a general matter, Rama's interpretation of *Camilo*'s enhanced-duty standard is too broad. *Camilo* can be distinguished, as it is a treating-physician-rule case in which the

ALJ failed to follow-up with a treating psychiatrist to clarify a crucial fact—*i.e.*, whether the psychiatrist's diagnosis (which was already in the record) "specifically address[ed] the time period [at issue]." *Id.* Such is not the case here. The additional information from the treating psychiatrist in *Camilo* was required, in part, because he could "opine as to . . . [the cause for] the lack of medical records [in the administrative record]." *Id.* By contrast, in this case, Dr. Hatten herself identifies one possible explanation for the relatively few treatment records, fittingly, in a treatment record from her that the ALJ did have: "[Rama's] intermittent adherence to scheduled appointments." AR at 591. Notably, in other psychiatric records from 2018 included in the administrative record, L.C.S.W. Rosario documented that "[patient] and therapist continue to discuss the importance of [treatment] consistently and need to improve [a]ttendance as [Rama] continues to miss session[s]." *Id.* at 436. Accordingly, the "facts of [this] particular [c]ase suggest that further development [was] [not] necessary to evaluate the claimant's condition fairly." *Shand*, 2023 WL 5162994, at *11.

Additionally, while the lack of treatment records from Dr. Kazakov (with whom Rama allegedly met "monthly for 30 min[utes] since 2015," AR at 595) is surprising given the 2,000-page supplement to the record, there is nothing to suggest that the ALJ specifically needed these records to fairly evaluate Rama's RFC. Indeed, Rama has repeatedly claimed that the record was sufficient without them, *see, e.g., id.* at 40 (counsel asserting during the hearing that he "believe[s] this case can be decided based on the [already submitted] medical record[s]"); *id.* at

37

422 (counsel asserting that "a [f]avorable [d]ecision [can] now be granted the claimant[]" in response to the addition of Exhibit 22F to the record, AR at 1222–1595); *id.* at 426 (similar, in response to the addition of Exhibits 23F and 24F to the record, AR at 1596–3326), and concedes that Dr. Hatten's records may even fill the very gap in the record that he argues should merit remand for failure to develop the record. *See, e.g.*, Pl. Mem. at 22 (noting while there were "no treatment notes from Dr. Hatten until 2020," "Dr. Hatten['s records] indicated in 2019 that . . . Rama had monthly psychiatric medication management" and it was clear that this was a follow-up visit from an "on-going treatment relationship" (citing AR at 436, 591, 2040, 2044–45)).[12]  While additional records could have been submitted, there is nothing to suggest that these records would have provided information that is "new and not merely cumulative of what is already in the record." *Hairston-Scott*, 2021 WL 3777581, at *2 (citation omitted).

Finally, even assuming these allegedly missing records were outcome determinative, Rama has repeatedly failed to avail himself of further opportunity to introduce them in this case.  He had the ability to introduce new and missing evidence both at the Appeals Council and at the present review stage of the proceedings, but has not done so.  *See* 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5)

---

[12] Rama also observes that Dr. Hatten's records (indicating that Rama had monthly psychiatric medication management) were consistent with 2018 records indicating he received monthly medication management from Dr. Gary Kennedy.  Pl. Mem. at 22 (citing AR at 436, 591) (erroneously referring to Dr. Kennedy as "Dr. Gregory").  This too suggests that, even if more evidence could have been added to the record, existing records were sufficient for the ALJ to have a sufficient picture of Rama's mental impairments.

(allowing Appeals Council to consider new, material evidence with good cause

shown); *see also* 42 U.S.C. § 405(g); *Hairston-Scott*, 2021 WL 3777581, at *2 (the

Court may remand for the Commissioner to consider new, material evidence with

good cause shown).  This failure also weighs against remand on this basis.  Rama

has not identified any further attempt to introduce allegedly missing documents

into the record, and instead has affirmatively represented that the record was

sufficient for a favorable decision to be made multiple times prior to the present

review stage.  *See* AR at 40, 422, 426.

## 2.  The ALJ Properly Evaluated the Record

In addition to properly developing the record, the ALJ properly evaluated the

record in determining the persuasiveness of the various medical opinions,

addressing the supportability and consistency of each one.  Rama claims that the

ALJ failed to properly evaluate the medical opinions of Drs. Kazakov and Hatten.

Pl. Mem. at 23.  The Commissioner responds that the ALJ properly applied the

applicable guidelines to evaluate the medical evidence offered by these doctors, and

the Court agrees.

In considering the persuasiveness of a medical opinion under the new

regulations, the ALJ must expressly address both (1) supportability and (2)

consistency.  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2).  Here, the ALJ found Dr.

Kazakov's opinion, that "[Rama] was unable to sit for more than [two] hours per day

or carry more than 10 pounds," unpersuasive because "[t]he severe restrictions

found [were] not supported by or consistent with any clinical examination finding or

treatment notes."  AR at 18.  She elaborated that "[r]epeated clinical examinations

have shown full 5/5 strength, normal neurological findings and stable gait and station." *Id.* The ALJ similarly found Dr. Hatten's opinion "that [Rama] had some marked mental limitation and would likely miss work more than [three] times per month . . . [un]persuasive." *Id.* She determined that Dr. Hatten's opinion "[was] not supported by or consistent with treatment notes, clinical examination findings or the conservative nature of the care prescribed." *Id.*

Rama does not offer any argument about the ALJ improperly evaluating the "supportability" factor. *See* Pl. Mem. at 23–27. Presumably, he does not present such an argument because he cannot justifiably claim that the opinions of Drs. Hatten and Kazakov are supported by medical evidence in the record while he simultaneously argues that, regarding a lack of medical records from these two doctors, the record is inadequately developed. *See* Pl. Mem. at 20–23.

Rama claims only that the ALJ improperly considered the "consistency" factor of the two medical opinions because they "could not be inconsistent" with a lack of (or in Dr. Kazakov's case, a complete absence of) treatment notes in the record. Pl. Mem. at 25–26. However, the regulation defines "consistency" in relation to "the evidence from *other* medical sources and nonmedical sources in the claim." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(a)–(c) (emphasis added); *see, e.g., Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022) ("The governing regulations require an ALJ to explicitly consider certain nonexclusive factors when making this determination: '(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the

opinion *with the remaining medical evidence*; and (4) whether the physician is a

specialist.'" (emphasis added) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d

Cir. 2019) (cleaned up))); *see also Conklin v. Kijakazi*, No. 21-CV-8486 (JLC), 2023

WL 104829, at *9 (S.D.N.Y. Jan. 5, 2023) ("With regard to consistency, 'the greater

the consistency between a particular medical source/opinion and the other evidence

in the medical record, the stronger that medical opinion becomes.'" (quoting *Acosta*

*Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at

*10 (S.D.N.Y. Jan. 29, 2021) (citations omitted), *adopted by* 2022 WL 717612

(Mar. 10, 2022))).   Therefore, the lack of medical treatment records from Drs.

Kazakov and Hatten is immaterial to the ALJ's finding that their opinions were

inconsistent with the other evidence in the record, and on this point Rama

otherwise recycles his argument of inadequate development of the record, which is

without merit.[13]

### 3.  The RFC Was Supported by Substantial Evidence

The ALJ determined an RFC that is supported by substantial evidence in the

record and is commensurate with the physical and psychological limitations

included in the medical opinions of Drs. Meisel, Goldstein, Putcha, Kirsch, Inman,

and Bruni, all of which she found persuasive.  *See* AR at 15.  Rama claims that the

ALJ determined an RFC with an exertional level—*i.e.,* that Rama could perform

---

[13] As the most important factors an ALJ must consider (and indeed, the only two
she is required to discuss) are "supportability" and "consistency," the Court need not
address Rama's contention (Pl. Mem. at 26) that the ALJ erred in finding Dr.
Hatten's opinion to be further unpersuasive due to "the conservative nature of care
prescribed."  AR at 18 (referring to "other factor" set out in 20 C.F.R.
§§ 404.1520c(c)(2), 416.920c(a)–(c)).

"light work" with additional limitations, *id.* at 15—inconsistent with the limitations noted in these medical opinions.  Pl. Mem. at 27.  The Commissioner counters that the RFC determination is supported by substantial evidence, as it need not "directly correspond" with any of the medical opinions, but only have a basis in "the record as a whole."  Def. Mem. at 14.

The Second Circuit has held that moderate limitations are not inconsistent with RFCs allowing for light work.  *See, e.g., Wright v. Berryhill*, 687 F. App'x 45, 47 (2d Cir. 2017) (upholding RFC determination allowing light work for individual found to have moderate exertional limitations due to severe mental impairments); *see also White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (upholding RFC determination allowing light work for individual found to have moderate exertional limitations due to severe physical impairments).  An RFC allowing for an exertional limitation of light work can sufficiently and appropriately accommodate the capacities of individuals with both moderate physical and psychological limitations, such as Rama.

There is thus no inconsistency in Rama's determined RFC that allows for light work with additional limitations.  The ALJ did not err when she determined the RFC based, in part, on Dr. Meisel's opinion (that Rama should avoid "mildly to moderately strenuous" activities) and the non-examining opinions of Dr. Putch and Dr. Kirsch (that "[Rama] can perform light work[]").  AR at 17–18.

Similarly, the ALJ did not err in basing her RFC determination allowing for light work on the medical opinion provided by Dr. Goldstein (that Rama has "mild

to moderate" mental limitations), as well as the opinions of Drs. Inman and Bruni (that Rama has "moderate mental limitations"). *Id.* at 18. Given the limitations provided in the medical opinions upon which, in conjunction with the record as a whole, the ALJ based her RFC determination, there was no error when she found Rama capable of light work with additional limitations. As the Commissioner observes, Def. Mem. at 15, the Court cannot reweigh the evidence in the record, which is essentially what Rama has requested the Court to do.

### 4. The ALJ Properly Evaluated Rama's Potential for Time Off-Task and Absenteeism

Rama also contends that the ALJ improperly evaluated Rama's potential for time off-task and absenteeism in determining his RFC. Pl. Mem. at 30. The Commissioner counters that "the [medical] opinions on which the ALJ relied did not assess significant limitation in keeping to a schedule or staying on task[,]" and therefore the RFC properly accounted for Rama's time off-task and absenteeism. Def. Mem. at 21. Based on Second Circuit precedent and the RFC determination that Rama "is limited to simple, repetitive and routine non-complex tasks," the Court agrees with the Commissioner. AR at 15.

"The Second Circuit has held that a moderate limitation in the area of concentration, persistence, or pace would not necessarily preclude the ability to perform unskilled work." *Lowry v. Comm'r of Soc. Sec.*, No. 15-CV-1553 (GTS) (WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017) (collecting cases), *adopted by* 2017 WL 1291760 (Apr. 6, 2017). Indeed, moderate limitation "findings alone are not necessarily enough to cast doubt on [plaintiff's] ability to maintain a routine."

*Santos v. Kijakazi*, No. 21-CV-1682 (JLC), 2022 WL 4354372, at *8 (S.D.N.Y. Sept. 20, 2022) (citing *Melisa G. v. Berryhill*, No. 18-CV-0508 (DJS), 2019 WL 2502726, at *5 (N.D.N.Y. June 17, 2019)).

The ALJ explicitly rejected the opinions of Drs. Hatten and Kazakov—which were more restrictive in their determination of Rama's limitations—for lack of support and inconsistency.  AR at 18.  Instead, and as even Rama himself points out, "Dr. Meisel, Dr. Bruni, and Dr. Inman—whom the ALJ all found persuasive—all agreed that . . . Rama had *moderate* limitations in sustaining an ordinary routine and regular attendance at work."  Pl. Mem. at 31 (emphasis added).  Because the authors of these medical opinions do not otherwise define "moderate," the Court assumes they use the term in the same manner as referred to by the *Lowry* court and as outlined in C.F.R. §§404.1520a(c)(4), 404.1520a(d)(1)–(2).[14]  *Cf. Santos*, 2022 WL 4354372, at *10 (finding "moderate loss" limitation, specifically defined by the medical source statement author as missing at least 33 percent of the workday, incongruous with an RFC "limit[ing] a plaintiff to simple, routine, and repetitive tasks").

---

[14] Section 404.1520a(c)(4) provides: "When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  Similarly, sections 404.1520a(d)(1) and (2) note that generally the points "non" and "mild" are considered "not severe" limitations, whereas all other points on the scale are considered "severe" limitations.

Furthermore, the ALJ specifically questioned the VE about Rama's potential for time off-task and absenteeism in making her RFC determination.  AR at 66–67. Rama claims the ALJ failed to adequately explain "how [Rama's] mental limitations affect his ability to function in a work-setting."  Pl. Reply at 6.  However, in support of this claim Rama cites to a line of cases where the ALJ failed to include *any* time off-task work limitations in the hypotheticals posed to the VE.  *See id.* (citing *Kohlhagen v. Saul*, No. 19-CV-113 (JLS), 2020 WL 4736322, at *5 (W.D.N.Y. Aug. 13, 2020).  Because the ALJ in this case included explicit time off-task work limitations in the hypotheticals posed to the VE, she did not "avoid conducting a 'detailed assessment'" of Rama's mental limitations.  *Id.* (quoting *Thompson v. Astrue*, No. 10-CV-6576 (CJS), 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012)).

The ALJ therefore properly evaluated the potential for Rama's time off-task and absenteeism in determining an RFC limiting Rama to performing unskilled work consisting of "simple, repetitive, and routine and non-complex tasks."  AR at 15; *see, e.g.*, *Lowry*, 2017 WL 1290685, at *4–5 (ALJ did not err where RFC limited plaintiff to "simple routine, tasks" and accounted for "moderate" limitations in maintaining routine).

### 5.  The ALJ Properly Evaluated Rama's Subjective Evidence

Finally, Rama argues that the ALJ failed to follow the legal requirements in determining a claimant's credibility when she found that Rama's subjective statements about the "intensity, persistence, and limiting effects of [his] symptoms . . . [were] not entirely consistent with the . . . evidence in the record."  Pl. Mem. at 33.  The Commissioner counters that the ALJ sufficiently considered all the medical

evidence and found it "did not corroborate [Rama's] subjective symptomology to the disabling extent alleged."  Def. Mem. at 23.

The ALJ must consider all seven of the credibility factors laid out in the regulations when making her determination, though she need not explicitly discuss all seven in her reasoning.  *See, e.g., Lane v. Saul*, 2020 WL 3965257, at *9; *Pena*, 2008 WL 5111317, at *11.  In considering whether the ALJ properly evaluated Rama's subjective medical evidence according to this standard, "[r]emand is not required where 'the evidence of record permits us to glean the rationale of an ALJ's decision.'"  *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see* 20 C.F.R. §§ 404.1529(a), (c)(3), 416.929(c)(3) (discussing how symptoms are evaluated and relevant factors that may be considered).

Though the ALJ need not (and did not) explicitly identify all the factors she considered, she did discuss: Rama's cardiac history and treatment; his emergency room workups; his prior stent placement; other physical health conditions and history; his mental health treatment history; and his consultative psychiatric examination.  AR at 18.  Most notably, the ALJ accounted for Rama's own reports of "not taking [prescribed] medications and/or le[aving] [hospital treatment] against medical advice," *id.* at 17–18, and expressly considered more than 500 pages in medical records and exhibits in her decision.  AR at 18.  The ALJ's assessment of this record evidence was thus sufficient to "glean the rationale of [her] decision," *Cichocki*, 534 F. App'x at 76, to determine that "[Rama's] statements concerning the

intensity, persistence and limiting effects of these symptoms . . . [were] not entirely consistent with the medical evidence and other evidence in the record." AR at 17.

### III. CONCLUSION

For all the foregoing reasons, Rama's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion is granted.

The Clerk is directed to mark the motion at Docket Number 18 as denied, and the motion at Docket Number 27 as granted, and enter judgment for the Commissioner.

**SO ORDERED.**

Dated: December 5, 2023
        New York, New York

JAMES L. COTT
United States Magistrate Judge